IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JEREMY MARTIN<br><br>Plaintiff,<br><br>v.<br><br>POKITDOK, INC., LISA MAKI, and THEODORE TANNER<br><br>Defendants. | CIVIL ACTION NO. 2:12-cv-02155-DCN<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jeremy Martin hereby respectfully alleges:

**JURISDICTION AND VENUE**

1. This action arises under federal copyright law, and includes pendent claims under South Carolina state law.

2. The Court has jurisdiction over Plaintiff's copyright claims pursuant to 17 U.S.C. § 101 *et seq*. and 28 U.S.C. §§ 1331 and 1338.

3. Plaintiff's copyright claims relate to three complete copyright applications filed pursuant to 17 U.S.C. §§ 408 and 409 with the required fees and deposits on July 31, 2012, which have been assigned application numbers 1-802534131, 1-802621348, and 1-802621524. Copies of those applications are respectively attached as Exhibits 1, 2, and 3.

4. The Court has supplemental jurisdiction over Plaintiff's claims arising under South Carolina state law pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal copyright claim that they form part of the same case or controversy and derive from a common nucleus of operative facts.

5. Venue is proper in the District of South Carolina pursuant to 28 U.S.C. §§ 1391 and 1400(a) because a substantial part of the acts and omissions alleged in this Complaint occurred in Charleston, South Carolina, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

6. Plaintiff demands a jury trial for all issues so triable.

## PARTIES

7. Plaintiff Jeremy Martin is a United States citizen residing in Charleston, South Carolina, and the author and owner of the copyrights at issue in this action.

8. Upon information and belief, Defendant PokitDok, Inc. is a Delaware corporation having its principal place of business in Menlo Park, California. Upon information and belief, PokitDok, Inc. currently conducts business and has offices and employees in Charleston, South Carolina.

9. Prior to its incorporation and during a period when a substantial part of the acts and omissions alleged in this Complaint occurred, PokitDok, Inc. was unicorporated and operated by its promoters, Defendant Lisa Maki and Defendant Theodore Tanner, and had its only office and principal place of business in Charleston, South Carolina.

10. PokitDok, Inc. has a certificate of authority to transact business in South Carolina, as well as a registered agent in South Carolina.

11. Upon information and belief, Defendant Lisa Maki is a United States citizen currently residing in Menlo Park, California. During a period when a substantial part of the acts and omissions alleged in this Complaint occurred, Ms. Maki was a resident of South Carolina. Moreover, Ms. Maki committed a substantial part of her acts and omissions alleged in this

Complaint in South Carolina. Upon information and belief, Ms. Maki owns real property in Charleston, South Carolina.

12. Upon information and belief, Defendant Theodore Tanner is a United States citizen residing in Charleston, South Carolina.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. Mr. Martin Is A Software Engineer Highly Sought After By Web Related Start-Ups

13. Mr. Martin is a senior level software engineer. He holds a B.S. in Computer Science from The Master's College in Santa Clarita, California. He has worked for several corporations and government organizations, and currently is employed by SPARC, LLC in Charleston, South Carolina. He is also the author of a technical blog that averages 120,000 monthly page views, the inventor of a patent pending system and method for efficient execution of highly concurrent and interdependent units of code, and a contributor to some of the most widely used open source libraries worldwide, including Twitter Bootstrap.

14. Mr. Martin possesses particular software engineering expertise in both client and server-side technologies, including web application security, distributed system architectures, RDBMS and NoSQL databases, JavaScript, HTML, CSS, Ajax, DHTML, and jQuery. The breadth of this expertise makes Mr. Martin an extraordinarily versatile and valuable asset to any web development project.

15. Because of his expertise, Mr. Martin is often approached by web related start-ups. Because of the inherent risk in working with start-ups, Mr. Martin does not invest time or energy in those companies unless he believes the equity interest he has been offered has the potential to generate a return exponentially greater than a standard hourly rate for software engineering services.

B. **Mr. Martin Is Recruited Onto The PokitDok Founding Team Under Repeated Promises Of "A Lot Of Equity"**

16. Ms. Maki and Mr. Tanner each have over 20 years of experience in the software industry, serving as executive managers in companies such as Microsoft and participating in multiple start-up companies.

17. Upon information and belief, Ms. Maki and Mr. Tanner are sophisticated businesspeople and were, at all times relevant to this Complaint, knowledgeable about basic copyright and contract obligations, and what it means to grant equity to founding members of a start-up company to be formed.

18. At one time, Mr. Martin, Ms. Maki, and Mr. Tanner were coworkers at Benefitfocus, Inc., a web related company based in Charleston that has been a widely publicized success, growing quickly into a large company since its founding in 2000.

19. Via e-mail dated June 4, 2011, Mr. Tanner disclosed that he and Ms. Maki had been "fired" by Benefitfocus, Inc.

20. Mr. Martin chose to leave Benefitfocus, Inc. after being offered a higher salary at SPARC, LLC. Benefitfocus, Inc. counter-offered with an even higher salary in an attempt to keep Mr. Martin from leaving the company.

21. In or around May of 2011, Ms. Maki and Mr. Tanner, working in Charleston, sought out a select few local software engineers to be founding members of a start-up company that would develop a web-based health care information service, which they referred to as PokitDok (using a variety of spellings).

22. Upon information and belief, Ms. Maki and Mr. Tanner did not personally possess the expertise necessary to design and build the PokitDok website and underlying infrastructure.

23. Ms. Maki and Mr. Tanner believed that a first version or prototype of the PokitDok website and underlying infrastructure would have to be designed and built before venture capital firms and other potential investors would invest in the company to be formed.

24. Ms. Maki and Mr. Tanner thus targeted their former co-worker, Mr. Martin, as a preferred candidate to join their founding team, who could help design and build the PokitDok website and underlying infrastructure.

25. Ms. Maki and Mr. Tanner contacted Mr. Martin and asked him to join their effort as a founding member of the PokitDok team, specifically to help design and build the PokitDok website and underlying infrastructure, promising in return "a lot of equity" in the company to be formed. This promise was reaffirmed many times orally and in writing through e-mail and instant messages.

26. For example, an e-mail from Mr. Tanner to Mr. Martin, et al., dated June 4, 2011, states as follows:

> *"People talk about doing startups all the time yet they do not realize that it takes initial effort (ie sweat equity) . . . Lisa and I are moving forward on this and getting the team together at this time – sweat equity – as the VCs have stated – as they do most times – they need a prototype or something that looks plausible . . . Please reply all to this email as I consider you the initial core of the team."*

27. For another example, an e-mail from Ms. Maki to Mr. Martin, et al., dated June 4, 2011, states as follows:

> *"There are lots of reasons to join a startup: . . . you get to make a lot of money, I mean, a lot of money . . . . The reason why engineers like you put in sweat equity now as the founding team is when we sell it you get more of the proceeds than any other engineer hired from now on."*

28. For another example, instant messages between Mr. Tanner and Mr. Martin, dated June 14, 2011, state as follows:

> *Mr. Martin: "any details on what compensation would be?"*
>
> *Mr. Tanner: "a lot of equity"*

29. Under these clear and simple terms, on or about June 14, 2007, Mr. Martin agreed to join the PokitDok founding team and began work on the PokitDok website and underlying infrastructure.

30. Ms. Maki and Mr. Tanner explicitly accepted that Mr. Martin would contribute to the PokitDok project in return for an equity interest in the company to be formed and that he would continue to work full-time with SPARC, LLC until PokitDok received seed funding and could afford to pay Mr. Martin a comfortable salary in addition to his equity interest.

31. For example, an e-mail from Ms. Maki to Mr. Martin, et al., dated June 30, 2011, states as follows:

> *"Jeremy, you could stay at 15 hours/week and I'd look at it as a sweat equity contribution in exchange for shares until you and Annie feel you can come on board full time at a reduced salary. I will always appreciate your contribution."*

32. For another example, an e-mail from Ms. Maki to Mr. Martin, et al., dated July 1, 2011, states as follows:

> *"We both feel you will contribute to the team, even in a part time role, and hope there will be the chance for you to reconsider coming on full time in the further . . . we know you are very interested in contributing as much as you can and still meet your commitments at home. Ted and I will be working on equity and hiring plans over the next week as I hear more from Seattle."*

33. To be clear, Mr. Martin was a founder of the company to be formed, not an employee. For instance, he was not paid a salary, hourly wage, or commission, and he was not asked to fill out a Form W2 for the IRS.

## C. Mr. Martin Writes Code And Builds The PokitDok Website

34. Over the following three and a half months, Mr. Martin wrote code for the PokitDok website and underlying infrastructure.

35. As the author, all available copyrights in that code vested in Mr. Martin.

36. Mr. Martin did not assign any such copyrights to Ms. Maki, Mr. Tanner, PokitDok, Inc., or any corporate or unincorporated predecessor to PokitDok, Inc.

37. To meet Ms. Maki's and Mr. Tanner's demands in designing and building the PokitDok website and underlying infrastructure in order to quickly have a prototype ready to show potential investors, Mr. Martin worked through the nights and weekends.

38. Mr. Martin invested his free time and sacrificed the overall quality of life enjoyed by he and his wife, pursuant to a calculated risk that PokitDok would be a success and his promised equity interest would generate millions of dollars. He would not have made such sacrifices for an hourly wage, as his financial circumstances did not require that Mr. Martin work a second job.

39. Ms. Maki and Mr. Tanner repeatedly assured Mr. Martin orally and in writing that that his sacrifices would be worthwhile and, should PokitDok become a success, his equity interest would make him rich.

40. Ms. Maki and Mr. Tanner and other team members constantly praised Mr. Martin's work product, orally and in writing, and stressed its upmost importance in attracting venture capital investors, as demonstrated in the following e-mails:

E-mail from Ms. Maki to Mr. Martin, et al., June 16, 2011.

*"P.S. let everyone know you already did the Meeplace/Drupal comparison as well... Nice."*

E-mail from Mr. Tanner to Mr. Martin, et al., July 1, 2011.

*"Thnx Jeremy SEO is going to be hugely important for PD."*

E-mail from Mr. Tanner to Mr. Martin, et al., July 12, 2011.

*"JM looks great I wouldn't worry about the prefixes right now. Heck even the name of the company could change at this point – right?"*

E-mail from Brian Corbin to Mr. Martin, et al., July 12, 2011.

*"Man, I'm glad you came back from vacation. It would have taken me *YEARS* to get the design to this point. Outstanding!"*

E-mail from Ms. Maki to Mr. Martin, et al., July 12, 2011.

*"Jeremy, thank you for the headsup about the slash, I was just about to panic that I had to tell you all it wasn't' working. Got to the main page and it looks beautiful."*

E-mail from Mr. Tanner to Mr. Martin, et al., July 16, 2011.

*"jeremy great job with the CSS jockeying"*

E-mail from Ms. Maki to Mr. Martin, et al., July 18, 2011.

*"Thanks Jeremy, and everyone – the stylings look awesome and it's great to see the reviews take shape . . . if for some reason I can't make progress in Seattle this week it will not be because you didn't make enough progress on the prototype. There are a ton of other factors. That said, everything you do helps, tremendously. Great work, thank you, more later."*

E-mail from Ms. Maki to Mr. Martin, et al., July 18, 2011.

*"John and Jeremy have done an awesome job of getting the reviews page running, populated with data and styled."*

E-mail from Ms. Maki to Mr. Martin, et al., August 15, 2011.

> *"OK, I just got a call from Jeremy and explained to him that if we could get the home page with find working and the me page I would have enough to go back to these guys."*
>
> E-mail from Ms. Maki to Mr. Martin, et al., September 8, 2011.
>
> *"I followed up with Daniel today and first off you should know that he thought the basic design of the site was good—nice, clean and simple = - so give yourselves a pat on the back and a PBR!"*
>
> E-mail from Ms. Maki to Mr. Martin, et al., September 19, 2011.
>
> *"Our company is real and we have amazingly smart people on the team to help get all the work you, Corbin and Jeremy have done out in front of customers in the best possible way..."*

41. From the limited records available to Mr. Martin prior to discovery, Mr. Martin contributed at least 2,658 lines of code to the PokitDok Main Website repository, in addition to evaluating, selecting, arranging, and implementing open source code, and building a preliminary Drupal-based prototype.

42. Specifically, when Mr. Martin first joined the PokitDok team, development on the web application had not yet begun. Mr. Martin began work on an initial version of the PokitDok prototype using Drupal (a Content Management System that specializes in rapid and flexible development of social, content-driven applications). In this initial, Drupal-based prototype, Mr. Martin created a baseline structure for the site, enabled user signup and authentication through Facebook Connect, added improvements for Search Engine Optimization (SEO), and created basic functionality allowing members to define, enumerate, and discuss medications.

43. While this initial prototype was showing good progress, Mr. Martin was the only member of the team with expertise using Drupal, and it was not the ideal technology for future integration with mobile applications. For these reasons, it was collectively decided to transition toward a prototype with a different platform.

44. Of the developers on the PokitDok team, Mr. Martin had the most experience with the necessary client-side technologies (running in the browser). These technologies include the HTML, CSS, and JavaScript languages, as well as their applied techniques, such as Asynchronous JavaScript and XML (Ajax), and Dynamic HTML (DHTML). Ajax, which refers to communication between the browser and the server in between full page reloads, was particularly heavily utilized for user interactions. Therefore, much of Mr. Martin's code centered around encapsulating these Ajax interactions through an easy to consume, client-side API (Application Programming Interface).

45. Outside of the Ajax interactions, Mr. Martin also worked on the design and implementation of the "look and feel" of the prototype website. This work included static mockups of the site in Photoshop, as well as the HTML and CSS to bring the prototype inline with the mockups. This work played an especially significant role in early fund raising, as the HTML and CSS code defined what the investors could see during product demos.

**D. Using The Website Prototype, PokitDok Gains Attention And Investors**

46. Upon information and belief, after viewing the prototype that was largely designed and built by Mr. Martin, on or about July 16, 2011, Mr. Jonathan Sposato verbally committed to investing $50,000 to $100,000 in the company to be formed.

47. Mr. Jonathan Sposato is well known in Silicon Valley for being the only individual to start and sell two companies to Google (Picnik and Phatbits). Given his reputation and connections, his investment in PokitDok was a substantial boost to the company to be formed, opening doors for further venture capital investment.

48. Upon information and belief, soon thereafter, Mr. Sposato and other investors verbally committed to up $350,000, contingent upon raising additional funds.

**E. PokitDok Incorporates In Delaware**

49. PokitDok, Inc. was incorporated on September 6, 2011 in the State of Delaware.

50. Despite being one of the founders of the company, Mr. Martin was not included in the incorporation process led by Ms. Maki and Mr. Tanner. For instance, he was not given notice of his right to vote as a shareholder in the company on electing directors. Indeed, Ms. Maki and Mr. Tanner elected themselves as directors.

51. Nevertheless, Mr. Martin continued his work on the PokitDok website post-incorporation pursuant to his agreement that he was one of the founders of the Company and entitled to "a lot of equity." By way of Mr. Martin's continued performance and the newly formed Company's acceptance thereof, Mr. Martin's promised equity interest was ratified by the Company.

**F. PokitDok, Inc. Looks To Replace Mr. Martin With An Engineer From Silicon Valley**

52. Upon information and belief, in September of 2011, Ms. Maki, Mr. Tanner, and Mr. Sposato recruited a Silicon Valley engineer, Daniel Witenberg, to join PokitDok, Inc.

53. Upon information and belief, Mr. Witenberg was formerly a designer for Lego Universe and, at the time, he was the lead designer of Angry Birds, which is the most popular downloaded mobile game "app" of all time.

54. Upon information and belief, Mr. Witenberg's expertise largely overlapped with Mr. Martin's.

**G. Mr. Martin Is Excommunicated From The PokitDok Team**

55. Despite several months of hard work and valuable contributions, which directly enabled the Company to attract investors and position itself for further investment and

opportunities, via e-mail dated September 27, 2011, Mr. Tanner abruptly excommunicated Mr. Martin from the PokitDok team, stating as follows:

> *"As of today, the people who participated on today's call on are definitely on the PD team. For the rest of you, we'll be taking you off the distribution list. . . . These are personal contacts and I am not going to fuck this up wasting time trying to motivate people here in the South. Very soon I will be going to the PD valley offices a minimum of a week per month when we close this round. No one and I repeat no one in the South has ever had access to this type of money, contacts and team. You had the UX designer for fucking angry birds and lego universe on the phone today . . . We have other people of the same caliber waiting to talk to us."*

56. On that same day, September 27, 2011, Mr. Martin's password to access the PokitDok website code repository was deactivated.

57. Mr. Tanner's purported excuse that Mr. Martin had not participated on a conference call and was not motivated or contributing enough time to PokitDok was merely a pretext, and otherwise not sufficient grounds for excommunication, and irrespectively would not nullify Mr. Martin's equity interest in the company, as promised and already duly earned. That conference call was deliberately scheduled on a Tuesday afternoon, which was during normal work hours when it was known that Mr. Martin would be unable to participate. Again, Ms. Maki and Mr. Tanner had explicitly agreed when Mr. Martin joined as a founder that he would contribute to PokitDok during the hours outside of his full time job with SPARC, LLC until PokitDok could afford to offer him a comfortable salary *in addition* to his equity interest.

58. Upon information and belief, Ms. Maki and Mr. Tanner decided to excommunicate Mr. Martin from the PokitDok team in an attempt to avoid issuing Mr. Martin his equity interest so that they could retain more equity for themselves, and have more equity to offer to prospective investors and employees.

## H. PokitDok Inc. Continues To Use And Benefit From Mr. Martin's Code

59. Soon after excommunicating Mr. Martin, on November 3, 2011, PokitDok, Inc. filed a Form D Notice of Exempt Offering of Securities with the United States Securities and Exchange Commission providing that $450,001.00 of equity stock in the Company had been sold.

60. On June 27, 2012, PokitDok, Inc. filed an Amended Form D Notice of Exempt Offering of Securities with the United States Securities and Exchange Commission providing that $1,300,000.00 of equity stock in the Company had been sold.

61. To date, Mr. Martin has not received the equity interest promised and duly earned by him in PokitDok, Inc., or payment of any kind for his work and intellectual property contributions to the PokitDok website and underlying infrastructure.

62. Meanwhile, PokitDok, Inc., Lisa Maki, and Theodore Tanner have benefited from the use of Mr. Martin's copyrighted code and derivatives thereof, raising a total of $1,300,000.00 in venture capital funding, and creating the significant business opportunities.

63. Upon information and belief, the $1,300,000.00 in venture capital funding represents only a fraction of the total valuation of PokitDok, Inc.

64. Upon information and belief, the $1,300,000.00 in venture capital funding only represents the first or preliminary round of funding, and PokitDok, Inc. intends to raise additional venture capital funding in subsequent rounds.

65. Upon information and belief, Ms. Maki and Mr. Tanner each hold a significant amount of equity in PokitDok, Inc.

## I. Mr. Martin Demands That PokitDok Cease and Desist Using His Copyrighted Code

66. On June 27, 2012, Mr. Martin, by and through counsel, sent a letter by certified mail to Ms. Maki, Mr. Tanner, and PokitDok, Inc.'s registered agent, demanding that they cease and desist use of Mr. Martin's copyrighted code and all derivatives thereof and demanding they grant Mr. Martin his equity interest, as promised and duly earned.

67. On June 27, 2012, records attached and incorporated as Exhibit 4 show that certain lines of Mr. Martin's code in its original form were still actively being used on the PokitDok website. Mr. Martin obtained these records by saving a copy of the PokitDok website homepage, as any member of the public is entitled to do.

68. Upon information and belief, the entire infrastructure of the PokitDok website is not accessible to the public. Accordingly, the records attached as Exhibit 4 may only represent a small percentage of the evidence showing the use of Mr. Martin's code to be uncovered in discovery.

69. By and through a letter prepared by counsel dated July 10, 2012, Ms. Maki, Mr. Tanner, and PokitDok, Inc. denied that Mr. Martin's code was still being used on the PokitDok website. Additionally, that letter falsely denied that Mr. Martin had been excommunicated and falsely insinuated instead that Mr. Martin voluntarily quit and is therefore entitled to nothing. A copy of that letter is attached as Exhibit 5.

70. Upon information and belief, on or about June 28 or 29, 2012, PokitDok, Inc. covertly undertook an effort to remove evidence of their continued use of Mr. Martin's code by refactoring or modifying certain lines of code. This refactoring or modifying constitutes an unlawful derivative use of Mr. Martin's copyright.

71. Upon information and belief, from the limited access to PokitDok's code prior to discovery, Mr. Martin's copyrighted code and/or derivatives thereof remain embedded in the PokitDok website and its underlying infrastructure.

72. In order to prevent further infringement, the PokitDok website (www.pokitdok.com) must be taken down off of the internet unless and until PokitDok, Inc. obtains a license to use Mr. Martin's copyrighted code and derivatives thereof.

## FOR A FIRST CAUSE OF ACTION

### (Copyright Infringement and Preliminary and Permanent Injunction)

73. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

74. A substantial amount of Mr. Martin's code related to the PokitDok website and underlying infrastructure is original creative expression fixed in a tangible medium that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq.*

75. With regard to that copyrightable subject matter, Mr. Martin has filed three complete copyright applications pursuant to 17 U.S.C. §§ 408 and 409 with the required fees and deposits on July 31, 2012, which have been assigned application numbers 1-802534131, 1-802621348, and 1-802621524.

76. Without consent, authorization, approval, or license, PokitDok, Inc., Ms. Maki, and Mr. Tanner knowingly, willingly, and unlawfully copied, prepared, published, distributed, and displayed Plaintiff's copyrighted work, portions thereof, or derivative works and continues to do so.

77. Upon information and belief, PokitDok, Inc., Ms. Maki, and Mr. Tanner's infringements are and have been knowing and willful.

78. By this unlawful copying, use, display, publication, distribution, and preparation of derivative works, PokitDok, Inc., Ms. Maki, and Mr. Tanner have violated Mr. Martin's exclusive rights under 17 U.S.C. § 106.

79. PokitDok, Inc., Ms. Maki, and Mr. Tanner have realized unjust profits, gains and advantages as a proximate result of their infringement.

80. PokitDok, Inc., Ms. Maki, and Mr. Tanner will continue to realize unjust profits, gains and advantages as a proximate result of its infringement as long as such infringement is permitted to continue.

81. Mr. Martin is entitled to a preliminary and permanent injunction restraining PokitDok, Inc., Ms. Maki, and Mr. Tanner from engaging in any further such acts in violation of the United States copyright laws. Unless PokitDok, Inc., Ms. Maki, and Mr. Tanner are enjoined and prohibited from infringing Mr. Martin's copyrights, and unless the infringing PokitDok website is taken down, PokitDok, Inc., Ms. Maki, and Mr. Tanner will continue to intentionally infringe and induce infringement of Mr. Martin's copyrights.

82. As a direct and proximate result of PokitDok, Inc., Ms. Maki, and Mr. Tanner's willful copyright infringement, Mr. Martin has suffered, and will continue to suffer monetary loss. Mr. Martin is entitled to recover from PokitDok, Inc., Ms. Maki, and Mr. Tanner, in amounts to be determined at trial, the damages sustained and will sustain, and any gains, profits, and advantages obtained by PokitDok, Inc., Ms. Maki, and Mr. Tanner as a result of their acts of infringement.

**FOR A SECOND CAUSE OF ACTION**

**(Conversion and Preliminary and Permanent Injunction)**

83. Plaintiff hereby restates the allegations set forth above and incorporates them by

reference.

84. Defendants have and continue to intentionally and willfully store and use Mr. Martin's computer code, which includes original copyrightable work and non-copyrightable work product, without compensating him therefor, as promised with "a lot of equity" in PokitDok, Inc.

85. Mr. Martin's computer code and related work product is the sole and exclusive property of Mr. Martin. Mr. Martin has an exclusive right to possession and distribution of such property, which is a valuable asset to Mr. Martin created through his hard work and ingenuity.

86. Mr. Martin did not grant an express license to Ms. Maki, Mr. Tanner, PokitDok, Inc., or any predecessor of PokitDok, Inc. to use his code. Any implied consent to use such property was conditional upon the performance of Ms. Maki and Mr. Tanner's promise to grant him equity in PokitDok, Inc. Upon Mr. Martin's excommunication without compensation, any implied consent by Mr. Martin for the use of his code was retroactively revoked by failure of said condition.

87. Defendants have been in knowing and unauthorized possession and control of such property starting in June 2011 to the present. Since that time, Defendants have been obtaining unjust and substantial benefit from Mr. Martin's property without Mr. Martin's consent and without paying Mr. Martin for the value of such property.

88. Defendants' improper assumption and exercise of dominion and control over Mr. Martin's property has and will continue to interfere with and diminish Mr. Martin's rights in that property.

89. Allowing Defendants to retain the benefits received as a result of their wrongful acts would unjustly benefit Defendants at Mr. Martin's expense.

90. As a direct and proximate result of Defendants' actions, Mr. Martin has lost, and will continue to lose, profits in an amount to be determined at trial. Defendants' wrongful conduct was a substantial factor in causing this harm.

91. Plaintiff is entitled to an award of the value of the property taken, with interest, and other damages in an amount to be proven at trial. In addition, or in the alternative, Plaintiff is entitled to restitution of the Defendants' ill-gotten gains. Plaintiff will seek its election of remedies at trial.

92. Mr. Martin is entitled to a preliminary and permanent injunction restraining PokitDok, Inc., Ms. Maki, and Mr. Tanner from engaging in any further unlawful use of Mr. Martin's code or related work product. Unless PokitDok, Inc., Ms. Maki, and Mr. Tanner are enjoined and prohibited from using Mr. Martin's code, and unless the infringing PokitDok website is taken down, PokitDok, Inc., Ms. Maki, and Mr. Tanner will continue to engage in conversion of Mr. Martin's code.

## FOR A THIRD CAUSE OF ACTION

**(Misappropriation and Preliminary and Permanent Injunction)**

93. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

94. Defendants have and continue to intentionally and willfully store and use Mr. Martin's computer code, which includes original copyrightable work and non-copyrightable work product, without compensating him therefor, as promised with "a lot of equity" in PokitDok, Inc.

95. Mr. Martin's computer code and related work product is the sole and exclusive property of Mr. Martin. Mr. Martin has an exclusive right to possession and distribution of such

property, which is a valuable asset to Mr. Martin created through his hard work and ingenuity.

96. Mr. Martin did not grant an express license to Ms. Maki, Mr. Tanner, PokitDok, Inc., or any predecessor of PokitDok, Inc. to use his code. Any implied consent to use such property was conditional upon the performance of Ms. Maki and Mr. Tanner's promise to grant him equity in PokitDok, Inc. Upon Mr. Martin's excommunication without compensation, any implied consent by Mr. Martin for the use of his code was retroactively revoked by failure of said condition.

97. Defendants have been in knowing and unauthorized possession and control of such property starting in June 2011 to the present. Since that time, Defendants have been obtaining unjust and substantial benefit from Mr. Martin's property without Mr. Martin's consent and without paying Mr. Martin for the value of such property.

98. Defendants' improper assumption and exercise of dominion and control over Mr. Martin's property has and will continue to interfere with and diminish Mr. Martin's rights in that property.

99. Allowing Defendants to retain the benefits received as a result of their wrongful acts would unjustly benefit Defendants at Mr. Martin's expense.

100. As a direct and proximate result of Defendants' actions, Mr. Martin has lost, and will continue to lose, profits in an amount to be determined at trial. Defendants' wrongful conduct was a substantial factor in causing this harm.

101. Plaintiff is entitled to an award of the value of the property taken, with interest, and other damages in an amount to be proven at trial. In addition, or in the alternative, Plaintiff is entitled to restitution of the Defendants' ill-gotten gains. Plaintiff will seek its election of remedies at trial.

102. Mr. Martin is also entitled to a preliminary and permanent injunction restraining PokitDok, Inc., Ms. Maki, and Mr. Tanner from engaging in any further unlawful use of Mr. Martin's code or related work product. Unless PokitDok, Inc., Ms. Maki, and Mr. Tanner are enjoined and prohibited from using Mr. Martin's code, and unless the infringing PokitDok website is taken down, PokitDok, Inc., Ms. Maki, and Mr. Tanner will continue to misappropriate Mr. Martin's code.

**FOR A FOURTH CAUSE OF ACTION**

**(Breach of Contract)**

103. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

104. Mr. Martin's oral and written agreement with Ms. Maki, Mr. Tanner, and PokitDok, Inc. is a valid and enforceable contract, providing that Mr. Martin would be entitled to equity as a founder of PokitDok, Inc. in return for his risk, expertise, and services writing code and designing and building the PokitDok website and underlying infrastructure.

105. Mr. Martin performed his obligations under that contract by writing computer code and designing and building the PokitDok website and underlying infrastructure.

106. Defendants have breached the contract by excommunicating Mr. Martin from the PokitDok team and failing to grant Mr. Martin his equity interest in PokitDok, Inc., as promised and duly earned.

107. Under the terms of the contract, Mr. Martin is entitled to his equity interest in PokitDok, Inc.

**FOR A FIFTH CAUSE OF ACTION**

**(Breach of Contract Accompanied by Fraudulent Acts)**

108. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

109. Mr. Martin's oral and written agreement with Ms. Maki, Mr. Tanner, and PokitDok, Inc. is a valid and enforceable contract, providing that Mr. Martin would be entitled to equity as a founder of PokitDok, Inc. in return for his risk, expertise, and services writing code and designing and building the PokitDok website and underlying infrastructure.

110. Mr. Martin performed his obligations under that contract by writing computer code and designing and building the PokitDok website and underlying infrastructure.

111. Defendants have breached the contract by excommunicating Mr. Martin from the PokitDok team and failing to grant Mr. Martin his equity interest in PokitDok, Inc., as promised and duly earned.

112. Defendants' breach was accompanied by the fraudulent acts of unfairly retaining and continuing to use Mr. Martin's code, a substantial portion of which was protected under copyright, unfairly retaining Mr. Martin's equity interest in PokitDok, Inc. for themselves, and falsely denying use of Mr. Martin's code after receiving his cease and desist letter.

113. Mr. Martin is entitled to his equity interest in PokitDok, Inc, in addition to punitive damages and attorneys' fees as a result of Defendants' breach of contract accompanied by fraudulent acts in an amount to be determined at trial.

**IN THE ALTERNATIVE, FOR A SIXTH CAUSE OF ACTION**

**(Quantum Meruit)**

114. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

115. Plaintiff conferred a non-gratuitous benefit on Defendants by writing code and designing and building the PokitDok website and underlying infrastructure and has not been granted an equity interest in PokitDok, Inc., as promised and duly earned.

116. Defendants have realized value from Mr. Martin's performance of building and designing the PokitDok website and underlying infrastructure, which is the Company's most important asset. Mr. Martin's work has enabled PokitDok, Inc. to attract venture capital investment and open the door to business opportunities.

117. Defendants have been unjustly enriched by their unjust retention of Mr. Martin's rightful share of the equity in PokitDok, Inc, as well as their unjust retention and use of Mr. Martin's computer code and derivatives thereof to date.

118. It would be inequitable for Defendants to retain the benefit of Mr. Martin's work without paying Mr. Martin for its value which is to be determined at trial in accordance with its benefit upon PokitDok, Inc.

**IN THE ALTERNATIVE, FOR A SEVENTH CAUSE OF ACTION**

**(Unjust Enrichment)**

119. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

120. Plaintiff conferred a non-gratuitous benefit on Defendants by writing code and designing and building the PokitDok prototype and website and has not been granted an equity interest in PokitDok, Inc., as promised and duly earned.

121. Defendants have realized value from Mr. Martin's performance of building and designing the PokitDok website and underlying infrastructure, which is the Company's most

important asset, and has enabled PokitDok, Inc. to attract venture capital investment and open the door to business opportunities.

122. Defendants have been unjustly enriched by their unjust retention of Mr. Martin's rightful share of the equity in PokitDok, Inc, as well as their unjust retention and use of Mr. Martin's computer code and derivatives thereof to date.

123. It would be inequitable for Defendants to retain the benefit of Mr. Martin's work without paying Mr. Martin for its value which is to be determined at trial.

**IN THE ALTERNATIVE, FOR AN EIGHTH CAUSE OF ACTION**

**(Promissory Estoppel)**

124. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

125. Ms. Maki and Mr. Tanner explicitly represented to Mr. Martin that he was a founder of the company to be formed as PokitDok, Inc., and would be granted "a lot of equity" in the Company in return for his services.

126. Mr. Martin reasonably believed those representations and relied thereon in performing software engineering services, specifically building and designing the PokitDok website and underlying infrastructure.

127. Ms. Maki and Mr. Tanner have personally benefited from Mr. Martin's services, which enabled PokitDok, Inc. to attract investors and create business opportunities.

128. Ms. Maki and Mr. Tanner should be estopped from claiming that Mr. Martin is not a founder of PokitDok, Inc.

129. Likewise, Ms. Maki and Mr. Tanner should be estopped from claiming that Mr. Martin is not entitled to "a lot of equity" in PokitDok, Inc.

130. Accordingly, Mr. Martin is entitled to "a lot of equity" as a founder of PokitDok, Inc.

**IN THE ALTERNATIVE, FOR A NINTH CAUSE OF ACTION**

**(Partnership by Estoppel)**

131. Plaintiffs repeat the above allegations as if fully set forth herein.

132. Ms. Maki and Mr. Tanner repeatedly represented to Mr. Martin that, in return for his risk, expertise, and engineering services, he would be a founding member in the company which was later formed as PokitDok, Inc. Certain of those representations were made in e-mails copied to third parties.

133. Being a co-founder of a start-up company to be formed is the equivalent of being a partner.

134. Based on those representations, Mr. Martin performed engineering services as agreed, specifically by designing and building the PokitDok website and underlying infrastructure.

135. As a founder or partner in the venture, Mr. Martin is entitled to his proportionate share of equity in the company formed as PokitDok, Inc. and Ms. Maki and Mr. Tanner are estopped from denying that Mr. Martin was not a partner in the unincorporated predecessor to PokitDok, Inc.

**FOR AN TENTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

136. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

137. Ms. Maki, Mr. Tanner, and Mr. Martin were co-founders of the company eventually formed as PokitDok, Inc., owing each other a fiduciary duty of loyalty and fair dealing.

138. Ms. Maki and Mr. Tanner breached that fiduciary duty to Mr. Martin by failing to grant him his promised equity interest in PokitDok, Inc. and retaining such interest for themselves, failing to provide notice of his right to vote as a shareholder in the Company, excommunicating him from the Company under false pretenses, and misappropriating Mr. Martin's code and receiving personal benefit therefrom.

139. Mr. Martin is entitled to the ill-gotten gains and equity interests obtained by Ms. Maki and Mr. Tanner through their breaches of fiduciary duty.

**FOR AN ELEVENTH CAUSE OF ACTION**

**(Constructive Trust)**

140. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

141. Ms. Maki and Mr. Tanner have unjustly retained for themselves Mr. Martin's promised and duly earned equity interest in PokitDok, Inc.

142. PokitDok, Inc. has been unjustly enriched with venture capital investment and further business opportunity as a result of unlawful use of Mr. Martin's code.

143. This Court should create a constructive trust as to Ms. Maki's and Mr. Tanner's equity interests in PokitDok, Inc. in favor of Mr. Martin.

144. This Court should also create a constructive trust in the venture capital funds, investments, and profits of PokitDok, Inc. in favor of Mr. Martin.

**FOR A TWELFTH CAUSE OF ACTION**

**(An Accounting)**

145. Plaintiff hereby restates the allegations set forth above and incorporates them by reference.

146. Since at least June 2011, Defendants have obtained benefit through the unlawful use of Mr. Martin's computer code and related work product knowingly, intentionally, and willfully.

147. As a result of Defendants' misconduct, Ms. Maki and Mr. Tanner have received additional equity in PokitDok, Inc.; the Company has obtained venture capital funding; the total valuation of the Company has increased; and Defendants have gained various business opportunities.

148. Some or all of such money and equity are rightfully due to Plaintiff.

149. The amount of money and equity due to Plaintiff cannot be ascertained without an accounting of PokitDok, Inc.'s profits, venture capital funding, valuation, and equity structure. Plaintiff is entitled, therefore, to a full accounting.

**FOR A THIRTEENTH CAUSE OF ACTION**

**(Reservation of Right to Assert Additional Causes of Action)**

150. Plaintiff hereby reserves his right to assert additional causes of action.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Martin prays for judgment as follows:

A. A preliminary and permanent injunction restraining PokitDok, Inc., Ms. Maki, and Mr. Tanner or their officers, agents, servants, employees, attorneys and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with it, from continued acts of infringement of the copyrights at issue in this litigation;

B. Entry of judgment holding PokitDok, Inc., Ms. Maki, and Mr. Tanner liable for copyright infringement, conversion, misappropriation, breach of contract, breach of contract accompanied by a fraudulent act, quantum meruit, unjust enrichment, promissory estoppel, partnership by estoppel, fraud in the inducement, breach of fiduciary duty, constructive trust, and an accounting;

C. An order that all copies made or used in violation of Mr. Martin's copyrights, and all means by which such copies may be reproduced, be impounded and destroyed or otherwise reasonably disposed of;

D. An order awarding Mr. Martin an equity percentage in PokitDok, Inc., actual, consequential, punitive, and statutory damages, lost profits, disgorgement, prejudgment and post-judgment interest, and costs and attorneys' fees;

E. An order for a full accounting of PokitDok, Inc.'s profits, venture capital funding, valuation, and equity structure; and

F. An order for a constructive trust as to Ms. Maki's and Mr. Tanner's equity interests in PokitDok, Inc. in favor of Mr. Martin, and likewise in the venture capital funds, investments, and profits of PokitDok, Inc. in favor of Mr. Martin.

G. Any and all other legal and equitable relief as may be available under law and which the Court may deem proper.

Respectfully submitted,

HELLMAN & YATES, PA

By: /s/ Jason S. Smith

Jason S. Smith
js@hellmanyates.com
S.C. Dist. Ct. Bar # 11387
Brian A. Hellman
bh@hellmanyates.com
S.C. Dist. Ct. Bar # 9662
145 King Street, Suite 102
Charleston, SC 29401
(843) 266-9099
(843) 266-9188 facsimile

Charleston, SC
August 1, 2012